IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW B. HARMON and SUSAN H. CLARKE, on behalf of the FMC Corporation Savings and Investment Plan, themselves, and a class consisting of similarly situated participants of the Plan, Plaintiffs, | : : : : : : : | CIVIL ACTION |
| v. | : : | |
| FMC CORPORATION, et al., Defendants. | : : | No. 16-6073 |

# MEMORANDUM

**Schiller, J.**                                                                                                                                      **March 16, 2018**

      Matthew Harmon and Susan Clarke sued FMC Corporation and several associated entities and individuals on behalf of themselves and other FMC employees. They claim Defendants breached their fiduciary duties under the Employee Retirement Income Security Act (ERISA) by offering imprudent and undiversified investment options as part of an employer-sponsored retirement plan. Defendants filed a motion to dismiss. Because the Complaint fails to state a claim, the Court grants the motion.

## I.    BACKGROUND

      FMC offers its employees access to a 401(k) defined contribution retirement plan (the "Plan").[1] (Am. Compl. ¶¶ 4, 38.) Participants in the Plan set up an individual account, make contributions, and allocate their assets as they see fit, selecting from a range of investment

---

[1] Plaintiffs sued FMC and the company's Employee Welfare Benefits Plan Committee and Pension Benefit Subcommittee, which oversee the Plan and its investments, as well as the individual members of these committees. (Am. Compl. ¶¶ 17, 20, 28.) Plaintiffs also assert claims against Pierre Brondeau, FMC's President and CEO. (*Id.* ¶ 27.) The Court will refer to these individuals and entities collectively as Defendants.

options. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss [Defs.' Mem.] at 4.) The Plan offers over thirty investment options for participants to choose from, selected by FMC Plan administrators. (*See* Compl. ¶ 64.) The options include FMC stock as well as a number of mutual funds with a range of risk and diversification profiles. (*See id.* ¶ 40.) The primary Plan offering at issue in this case is the Sequoia Fund, which both Plaintiffs claim to have held during the relevant period. (*See id.* ¶¶ 15–16.)

The Sequoia Fund was included in the Plan as one of five "long-term growth funds." (*Id.* ¶ 64.) It is a self-described "non-diversified" mutual fund. (*Id.* ¶ 67.) Throughout the time period at issue, the Sequoia Fund invested heavily in Valeant Pharmaceuticals stock. For a time, the Valeant investment generated substantial growth for the Sequoia Fund and, accordingly, the Plaintiffs. Valeant's stock price rose by more than 80 percent through the first half of 2015. (Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss [Pls.' Resp.] at 4.) As a result of this growth, coupled with additional stock purchases by the Sequoia Fund in October 2015, Valeant's position in the Sequoia Fund's portfolio grew from 14 percent in 2012 to 32 percent in 2015. (*Id.*; Am. Compl. ¶ 89.)

As it turned out, however, Valeant's apparent success was not long-lived. Questions about Valeant's accounting practices and drug pricing caused the company's share prices to plummet in late 2015. (Am. Compl. ¶¶ 73, 112.) In early 2016, Valeant announced that it was under investigation by the Securities and Exchange Commission ("SEC"). (*Id.* ¶ 93.)

Valeant's poor performance eventually led the Sequoia Fund to sell its shares in Valeant. In May 2016, when Valeant's stock price had dropped by nearly 90 percent in less than a year, the Sequoia Fund announced that it had sold half of its holdings in the company. (*Id.* ¶ 95.) By mid-June, the Sequoia Fund completely divested of its Valeant shares. (*Id.* ¶ 99.) By this time,

according to Plaintiffs, the Sequoia Fund's high concentration in Valeant stock had caused the Sequoia Fund to underperform the S&P 500 Index "by 6.14 percent in 2014, 8.68 percent in 2015, and 15.17 percent during the period from January 1 to June 15, 2016." (*Id.* ¶ 98.) As a result, Plaintiffs allege that the Plan and, therefore, the participants with holdings in the Sequoia Fund, lost millions of dollars. (*Id.* ¶ 154.)

According to Plaintiffs, these losses were preventable. They claim that Defendants should have removed the Sequoia Fund from the Plan before it became heavily concentrated in Valeant and Valeant's decline caused losses for the Sequoia Fund. (*See id.* ¶ 127.) By failing to do so, Plaintiffs argue, Defendants breached their fiduciary duty to monitor Plan investments and remove risky investment options. (*Id.*)

Plaintiffs claim that there were a number of red flags about Valeant's business practices and the Sequoia Fund's concentration in Valeant stock, beginning as far back as 2014, which should have prompted Defendants to rethink the inclusion of the Sequoia Fund in the Plan. (Pls.' Resp. at 4–8.) All of the warning signs Plaintiffs point to were in the public record. For instance, the Sequoia Fund disclosed its high concentration in Valeant and noted shareholders' concerns about the company in SEC filings and its annual report in 2015. (Am. Compl. ¶¶ 85, 94.) And in late 2015, a news article reported that two Sequoia Fund directors left as, according to Plaintiffs, "the Fund's Valeant position mushroomed and losses mounted." (*Id.* ¶ 91.)

Plaintiffs also point to criticisms of Valeant lodged by a handful of well-known investors and commentators between 2014 and 2016. (*See id.* ¶¶ 101–07.) Some of these investors took issue with Valeant's accounting methods and suggested that it was a "house of cards" and a "trust me story." (*Id.* ¶¶ 103, 105) In addition, Plaintiffs note multiple news articles from late 2015 and 2016 questioning Valeant's business and accounting practices. (*Id.* ¶¶ 113–15, 118.)

Plaintiffs claim that Defendants "ignored or did not notice" these warning signs about Valeant and the Sequoia Fund. (*Id.* ¶ 127.) They therefore allege that Defendants breached their duty under ERISA to monitor Plan investments and remove imprudent ones. (*Id.*)

Plaintiffs also point to a number of procedural steps Defendants had in place to monitor the Plan's investments, and argue that these procedures should have alerted them to the risks of the Sequoia Fund. For instance, in June 2015, members of FMC's Pension Investment Subcommittee met with representatives of Ruane, Cunniff & Goldfarb, Inc., the investment firm that managed the Sequoia Fund, to discuss the Sequoia Fund. (*Id.* ¶¶ 69–70.) Defendants also sought advice regarding the Plan's investments from Aon Hewitt, a consulting firm. (*Id.* ¶ 108.) In November 2015, that firm issued a review of the Plan in which it observed that the Sequoia Fund was "[e]xtremely concentrated," with "strong" long-term performance but "vulnerab[ility] to bouts of volatility due to lack of diversification." (*Id.* ¶¶ 108–09.) FMC Plan administrators did not remove the Sequoia Fund at this time.

The Pension Investment Subcommittee met again with Ruane Cunniff in March 2016 to discuss the Sequoia Fund's performance. (*Id.* ¶ 116.) The Committee determined not to take immediate action but to "continue to closely monitor the situation." (*Id.*)

Finally, after Aon Hewitt "proposed replacing the Sequoia Fund" with a different investment option in June 2016, the Committee decided to remove the Sequoia Fund. (*Id.* ¶¶ 119–122.) The Committee planned to make the switch in December 2016, but ultimately waited until March 2017. (*Id.* ¶ 122.)

In light of the publicly available information regarding Valeant, the Sequoia Fund's concentration in Valeant, and the investment monitoring procedures Defendants had in place,

Plaintiffs argue that Defendants should have recognized that the Sequoia Fund was an imprudent investment and removed it from the Plan sooner. (*See* Pls.' Resp. at 9.)

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 272 (3d Cir. 2001). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the federal rules do not impose a probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the court can only infer "the mere possibility of misconduct," the complaint must be dismissed because it has failed to show that the plaintiff is entitled to relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). When ruling on a motion to dismiss, the court must consider not only the allegations in the complaint itself, but also "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**III.    DISCUSSION**

ERISA imposes several duties on fiduciaries. Among these are the duties to: 1) act "in accordance with the documents and instruments governing the plan;" 2) diversify plan investments; and 3) invest plan assets prudently. 29 U.S.C. § 1104(a)(1). Plaintiffs allege violations of each of these duties. Although their analysis merges the duty to diversify into a subset of the general duty of prudence, the Court will discuss each duty separately.

**A.    Defendants' Compliance with the Plan Documents**

Plaintiffs' primary argument in response to the motion to dismiss is that Defendants violated their duty under ERISA to follow the Plan's governing documents. (*See* Pls.' Resp. at 11–13); 29 U.S.C. § 1104(a)(1)(D). They claim that the Plan documents required that each of the investment options included in the Plan be diversified, and therefore argue that Defendants breached the Plan and their fiduciary duty by offering the undiversified Sequoia Fund. At the very least, Plaintiffs argue, there is a question of fact as to the meaning of the Plan's language. (Pls.' Resp. at 20.)

This claim presents a question of interpretation. Plaintiffs point to language in the Plan's Statement of Investment Policies and Objectives ("Plan Statement") explaining that the Plan's "available investment options are intended to . . . [c]over a wide spectrum of risk/return characteristics" and "[b]e diversified." (Pls.' Resp., Ex. A [Plan Statement] at 1.) Plaintiffs argue that this language requires that *each* investment option be internally diversified. (*See* Pls.' Resp. at 12.)

Defendants argue that read in context, this language requires only that the Plan as a whole be diversified. (*See* Defs.' Reply Br. in Further Supp. of Defs.' Mot. to Dismiss [Defs.' Reply] at 4.) In support of this interpretation, they note that the Plan Statement says that the Plan is

intended to "comply with ERISA Section 404(c)," which allows qualifying plans to include undiversified investment options. (Plan Statement 1; *see* Defs.' Mem. at 24.) Defendants also note that certain language in the Plan Statement regarding Plan investment options "dovetails" the language of the regulations pursuant to § 404(c). (Defs.' Reply at 4.) The Plan Statement establishes that "[t]he Plan must offer a broad range of investment alternatives, including at least three core options that are internally diversified. . ." (Plan Statement at 1); to qualify as a § 404(c) plan under the regulations, a plan must offer "at least three investment alternatives . . . [e]ach of which is diversified. . ." 29 C.F.R. § 2550.404c-1(b)(3)(i)(B). Defendants also observe that there is no explicit language in the Plan itself or the Plan Statement requiring that each investment option be internally diversified. (Defs.' Reply at 4.)

Defendants' understanding of the Plan documents is correct. Three considerations lead the Court to this conclusion. First, § 404(c) and the corresponding regulations allow plans to include undiversified investment options as long as the plans are diversified as a whole. *See* 29 C.F.R. § 2550.404c-1(f)(5); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (explaining that ERISA's "legislative history and federal regulations clarify that the diversification and prudence duties do not prohibit a plan trustee from holding single-stock investments as an option in a plan that includes a portfolio of diversified funds"). Because the Plan documents explicitly state that the Plan is intended to comply with § 404(c), the meaning of the statute and regulations are persuasive in interpreting the documents.

Second, a common sense reading of the Plan documents leads to the same interpretation. As Defendants note, there is no language in the Plan explicitly requiring that each investment option be internally diversified. Meanwhile, the Plan Statement does require that the Plan offer "at least three core options that are *internally diversified*." (Plan Statement at 1 (emphasis

7

added).) The use of the term "internally diversified" in this instance, coupled with the absence of the term elsewhere, suggests that the drafter intended the internal diversification requirement to apply only to the three "core" options required by the Plan.

Third, the Plan Statement itself established that the Plan's investment options would include the Sequoia Fund. (Plan Statement at 4.) To find that the offering of the Sequoia Fund violated the Plan would therefore require a finding that the Plan Statement as written was internally inconsistent. Plaintiffs offer no reason to believe this is the case, and the Court finds it much more likely, particularly in light of the considerations discussed above, that the Plan was internally consistent. *See Manzella v. Paul Revere Life Ins. Co.*, Civ. A. No. 93-5455, 1994 WL 137003, at *3 (E.D. Pa. Apr. 19, 1994) ("A basic tenet of contract law is that a contract should be interpreted as a whole in a manner which does not render the contract internally inconsistent.").

In short, the Court finds Plaintiffs' interpretation of the Plan documents implausible. It takes a handful of words out of context and disregards the other considerations weighing in favor of Defendants' understanding of the documents' language. Because the Court finds that the Plan documents did not require Defendants to offer solely internally diversified investment options, the Complaint fails to state a claim that offering the Sequoia Fund violated the Plan documents and ERISA § 1104(a)(1)(D).

### B. The Duty to Diversify

Plaintiffs also argue that the Complaint plausibly states a claim that Defendants violated ERISA by failing to remove the Sequoia Fund due to its high concentration in Valeant stock, which Plaintiffs allege made the Sequoia Fund an imprudent retirement savings investment vehicle. (*See* Pls.' Resp. at 20.) Because ERISA allows plans to contain undiversified investment options, this claim fails as well.

ERISA requires fiduciaries to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). Plaintiffs argue that as the Sequoia Fund became more concentrated in Valeant, it created a risk of large losses for the Plan. (*Id.* at 20.) This argument, like the argument regarding the Plan documents, appears to rely on an interpretation of the ERISA language requiring each investment option to be diversified, rather than simply the Plan as a whole. (*See id.* at 16–17.) Under this interpretation, Defendants' offering of undiversified investment options such as the Sequoia Fund would be in violation of the statute.

However, the statute does not require that each investment option be diversified. "The language of [§ 1104(a)(1)(C)] contemplates a failure to diversify claim [only] when a plan is undiversified as a whole," not when "individual funds within the plan [are] undiversified." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2d Cir. 2009). Plaintiffs do not allege—and it does not appear that they could—that the Plan as a whole in this case was undiversified. Thus, the Complaint fails to state a plausible claim for failure to diversify.

### C. The Duty of Prudence

The duty of prudence requires ERISA fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man . . . would use" under similar circumstances. § 1104(a)(1)(B). Courts evaluate a fiduciary's prudence by "focusing on the fiduciary's conduct in arriving at an investment decision, not on its results, and asking whether [the] fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996). The duty includes a duty to monitor the plan's investment options by conducting a "regular review" of plan investments. *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1827 (2015). However, the

evaluation of a fiduciary's investment decisions cannot be made "from the vantage point of hindsight" because ERISA "requires prudence, not prescience." *See Pension Benefit Guar. Corp. ex rel St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013).

In order for a complaint alleging a violation of the duty of prudence to survive a motion to dismiss, a plaintiff must allege facts that support a finding that the defendant's process of managing the plan's investments was flawed. *St. Vincent*, 712 F.3d at 718. Because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail" prior to discovery, a complaint can survive a motion to dismiss by alleging circumstantial evidence that allows a court to "reasonably infer" a flaw in the process. *Id.*

The Complaint here falls short. It offers no direct allegations of flaws in Defendants' process. Indeed, the allegations regarding Defendants' investment-monitoring procedures tend to weaken Plaintiffs' case, not support it. As noted, the Complaint alleges that FMC's plan administrators met with Sequoia Fund managers on multiple occasions and sought regular reviews of the Plan investments from an outside consulting firm. Plaintiffs do not directly allege any imprudence in these procedures themselves.

Instead, Plaintiffs rely largely on circumstantial evidence. They claim that the Plan administrators should have realized the Sequoia Fund was an imprudent investment based on publicly available information regarding Valeant's poor performance and public criticism of the company's practices. Plaintiffs cite various news reports about Valeant's problems during 2015 and 2016, quotations from prominent investors and commentators, and public filings by Sequoia. Based on these public records and the procedures Defendants had in place, Plaintiffs claim that Defendants ignored the red flags about the Sequoia Fund's holding in Valeant.

However, the allegations, rooted as they are in public information, are insufficient to allow the Court to reasonably infer a flaw in Defendants' investment monitoring process. The Supreme Court has held that "where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special circumstances." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014). Plaintiffs' allegations fall squarely within this rule: they rely on public information to claim that Defendants should have recognized that Valeant, a publicly traded stock, was overvalued and thus a risky investment. Plaintiffs do not allege any special circumstances in this case; thus, under *Dudenhoeffer*, the public records cited cannot plausibly support a claim that Defendants beached the duty of prudence. Furthermore, the Complaint demonstrates that Defendants regularly consulted with experts on the Sequoia Fund.

Plaintiffs also cite *Muri v. National Indemnity Co.*, a recent case in which a court denied a motion to dismiss a duty of prudence claim based on the Sequoia Fund. Civ. A. No. 17-178, 2018 WL 1054326 (D. Neb. Feb. 26, 2018). However, the allegations in *Muri* differed from those here in a key respect. In *Muri*, the plaintiff alleged that the defendant "failed to have *any* meaningful procedures or processes in place to monitor the prudence of the Plan's investment offerings." *Id.* at *5 (emphasis added) (internal quotation marks omitted). Indeed, the *Muri* court distinguished the case from *Dudenhoeffer* based on the allegations regarding the defendant's deficient monitoring process. *See id.* at *5 n.2. Here, on the other hand, Plaintiffs have not alleged a complete lack of meaningful monitoring procedures. In fact, Plaintiffs have not explicitly alleged *any* defect in the monitoring process. Moreover, unlike what was alleged in the *Muri* complaint, Defendants here met with Sequoia Fund managers, sought the advice of a

consultant, and eventually followed the consultant's recommendation and replaced the Sequoia Fund with another option. Thus, if anything, the Complaint demonstrates that Defendants "conduct[ed] a regular review of investment options." *Id.* at *6.

The gist of Plaintiffs' claim seems to be that because there was public criticism of Valeant and Valeant's stock price ultimately plummeted, Defendants *must* have been imprudent in failing to remove the Sequoia Fund. But under *Dudenhoeffer*, Defendants could "prudently rely on the market price" of Valeant and the Sequoia Fund. 134 S. Ct. at 2471. Moreover, after an opportunity to amend their complaint based on limited early discovery from Defendants, Plaintiffs still have not put forth any other allegations, either direct or circumstantial, to allow the Court to "infer more than the mere possibility of misconduct" by Defendants in carrying out their duty to monitor the Plan investments. *Fowler*, 578 F.3d at 211. Therefore, Plaintiffs have failed to state a plausible claim.

### D. Plaintiffs' Collateral Claims

Plaintiffs raise several collateral claims in the Complaint, alleging that Defendants breached their duties of prudence and loyalty by creating unnecessary complexity in the Plan and offering investment options, including the Sequoia Fund, with high fees "instead of seeking comparable mutual funds with lower fees." (Am. Compl. ¶¶ 149–52.) The allegations regarding high fees and the duty of loyalty are conclusory; Plaintiffs offer no facts to "raise a reasonable expectation that discovery will reveal evidence" to support such claims. *See Phillips*, 515 F.3d at 234. As to the complexity claim, Plaintiffs do not provide legal support for this claim, and the Court finds none. The Court will dismiss it as well.

Plaintiffs also claim Defendants misinformed or failed to inform them about the risks of the Sequoia Fund. (Am. Compl. ¶ 145.) ERISA fiduciaries have an obligation to "inform

12

participants about the risks associated with investing in the plan." *In re Wilmington Trust Corp. ERISA Litig.*, 943 F. Supp. 2d 478, 491 (D. Del. 2013). Here, the Plan Summary described the available plan options in terms of their risk levels, encouraged participants to read funds' prospectuses, and informed participants of the benefits of diversification. (*See* Defs.' Mem., Ex. 1 [Plan Description] at 12.) These disclosures satisfy Defendants' duty to inform. *See Edgar v. Avaya, Inc.*, 503 F.3d 340, 350 (3d Cir. 2007), abrogated on other grounds by *Dudenhoeffer*, 134 S. Ct. 2459 (holding similar disclosures sufficient). Thus, the duty to inform claim fails.

Finally, Plaintiffs allege that Brondeau, FMC's President and CEO, is liable for failing to monitor other fiduciaries to ensure that they made informed and prudent decisions regarding the Sequoia Fund. (Am. Compl. ¶¶ 156–61.) They also argue that Brondeau is liable as a co-fiduciary. (*Id.* ¶ 162.) These claims are dependent on the primary breach of fiduciary duty claims. *See, e.g.*, *Johnson v. Radian Grp., Inc.*, Civ. A. No. 08-2007, 2009 WL 2137241, at *24 (E.D. Pa. July 16, 2009). Because the Court finds that those allegations fail to state a claim, the dependent claims against Brondeau must be dismissed as well.

Plaintiffs have requested leave to amend their Complaint should the Court find it fails to state a claim. However, it is not clear what additional facts Plaintiffs would or could allege. Plaintiffs have already amended their complaint once and received some pre-amended complaint discovery from Defendants. The Court finds that amendment would be futile and will deny leave to amend. *See Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000).

## IV. CONCLUSION

The Complaint fails to plausibly state a claim for relief under ERISA. Thus, the motion to dismiss is granted. An Order consistent with this Memorandum will be docketed separately.